United States v. Manuel Perez, case number 24-3040. Thank you. You may approach. Good morning, your honors. I'm Rebecca Abel. May it please the court. I represent Manuel Perez in this appeal. And by apologies, I have a little tickle in the throat. I would like to reserve three minutes for rebuttal, and I'll try and watch my clock. I'm going to focus my argument on the first two issues raised in the opening brief, which concern errors in the jury instructions. The first error was a constructive amendment to the 2242B statute, which was for abusive sexual contact. That statute includes six body parts, but only one was charged, the buttocks. I'll refer to it as the butt going forward. And this case really does revolve around whether Mr. Perez did or did not touch Eileen's butt. However, the jury instruction included six body parts, and of most issue here is one of them, which was the inner thigh. We're reviewing this under plain error. Is that correct? Your honor, I do think there's a basis to review de novo, but for purposes of today's argument, I do believe that the defense has demonstrated plain error for the purposes of both the first and second issue, the constructive amendment. But it wasn't objected to below. Yes, sir. Correct? That's correct. Okay. Yes. And I do believe that plain error has been established. As to the first, a constructive amendment for a long time in the case law was automatic reversal, regardless of whether it was de novo or plain error. And since then, the cases have demonstrated that there is a need to show prejudice, but that prejudice standard is not as substantial as it is in other contexts of just jury instruction error. And that's because any time there's evidence about the unindicted conduct, we can look to that unindicted conduct and wonder could or might have, and that is the standard, could or might have, the jury have convicted on that. So my concern with this argument or my skepticism about it is that I don't see any evidence at trial that the defendant touched one of the victims in the inner thigh. And so I think inner thigh was what you were keying in on, and it was one of the listed phrases in the instruction. But there wasn't any evidence adduced about inner thigh, was there? Yes, Your Honor. I do believe there was. And I just want to step back for a second. About inner thigh or touching the outer thigh, what was that evidence? Your Honor, specifically, thigh was mentioned 15 times by Eileen and specifically that Mr. Perez moved his hand inward. And then at closing, the government did – But that's not – I thought that inward referred to sort of the rotation of his hand, not where he moved his hand on the victim's body. I think they were joint. I think – I take Your Honor's point, but I do think that those two things could easily be misconstrued in the first instance. But that the repeated references to thigh, which were at issue, so as to Caitlin, all of the touches were allegedly on or around the thigh. Well, can I just jump in? I mean, remember the jury's hearing this after having heard the testimony of AAS. I think she reenacted it, right? She did a physical reenactment. So these words are not just in a vacuum. The jury has now seen and heard the victim describe exactly what she believed happened. That goes a long way to putting that jury instruction in context and eliminates confusion, doesn't it? I agree that it – so there was reenactment by Eileen as well as by defense counsel. And there was an impeachment video played in which reenactment was done by a special agent. So there were multiple different efforts at reenactment. But I actually think that it encourages further confusion because it's very clear that there was a question about what body part was touched. The jury may have thought, I see a lot of fighting about the butt, but no one here mentioned the inner thigh. But you've talked about thigh dozens of times throughout this trial, and maybe the defense just conceded that point. I'm not really sure I understand. And I think that really goes to the heart of the question. There was a lot of conversation about what body part was touched. That was really one of the two fights of the trial. And given that there was so much discussion about thigh, one victim was only ever touched on the thigh. And the second victim had two separate touches, one of which was only on the thigh. And there was movement of the hand in an inward direction. I think that members of the jury could or might have reasonably been confused about, well, why aren't we just – Even when the government in their closing arguments focused on buttock? Yes, Your Honor, and I would point to the defense counsel who honestly caused additional issues. He referenced at two separate points the multiple body parts in the statute, explicitly referencing the inner thigh, and didn't note that that wasn't charged. There was no correction offered by the court. He cites all the parts of the statute and just sort of asserts that they can't meet that burden. What about your assault argument? Yes, Your Honor. So the second issue relates to the charge of simple assault, and it is a simple assault charge. The statute itself, 113A5, is a simple assault charge. And that – the law in the Ninth Circuit has been clear for 40 years, that simple assault, as charged under the intent to frighten prong. Now, there are two prongs, an attempted battery and an intent to frighten. But here the jury instruction, number 20, expressly charged only the intent to frighten element. And under that element, the case law has been clear, Skeet, Lamont, Jim, that it's a specific intent crime and that it requires an intent to frighten as the actual name requires. Acosta, a 2012 case, says this is an intent to frighten. Well, let me just ask you about what's been clear in the Ninth Circuit. Skeet refers to the simple assault as a specific intent crime. And Lamont recognizes that a common law, that would be the case. But Lamont spoke about a different – one of the statutory provisions and called that a general intent crime. And I think we've had an unpublished case that notes this confusion as to whether this simple assault under the statute is a general intent or a specific intent crime. So I don't think it's clear, but tell me what you think about that. I do think it's clear. The Lamont case dealt with the assault by strangulation, which is under the Section 113, but is a completely different prong. And it then goes down the analysis of why that one is different. That's why Lamont discusses simple assault. And I want to be clear that the statute itself says the word simple assault. And when we have the word simple joined by assault, we import the common law understanding of that. And I would point to – Well, I mean, I guess going back to Lamont, Lamont talked about how that is generally true. But in that case, where that statutory provision, assault by strangulation, did not have the phrase with intent to, it construed that among – for other reasons as being a general intent crime. And here, simple assault, it's the same thing. It's not one of those phrases it has with intent to. But it does – and I would point the court to Jim, which – Jim points out that it actually includes the phrase willfulness, and willfulness implies a specific intent. That's what Jim said. But that's the other prong, right? That's not the prong that we're dealing with. No, Your Honor. The court in Jim imposes the willfulness on both prongs. The 1-1 – Jim dealt with a 1-1-1 statute, a federal officer case, assault on a federal officer. And it goes through and says, why is 1-1-3 different? 1-1-3 is different because it applied the common law definition, and it included a willfulness element. And then it defines why 1-1-1 is different, because it includes no such willfulness requirement. And I think when you read Skeet plus Jim plus Lamont, I believe, in that order, the courts have reinforced what they have held all along, which is that the common law definition of intent to frighten requires exactly what the title implies, an intent to frighten. And I would point the court to Ornelas, O-R-N-E-L-A-S, which is a case dealing with attempted robbery, a different statute. But in that case, the court expressly held that because the statute imported the common law, all we need to do is look at the common law, and if the common law says we have a specific intent requirement, that's sufficient. And found plain error based only on the fact that the common law is so required. Not pointing to the lengthy line of cases, Skeet, Lamont, and Jim, that we have here, that do, in fact, say what the common law says, which is that intent to frighten assault does have a specific intent requirement. And I take it your argument then is if it is a specific intent crime, then there are diminished capacity defenses and other things that could have been applied here. Yes, Your Honor. So let me add just on that point. The defense here did bring forward quite a bit of evidence about diminished capacity and intoxication. So why would there be a substantial injury to the rights of the defendant here if much of that evidence already came into the trial? Because the jury instruction expressly precluded the jury from considering it. It said, and this was a jury instruction that was jointly proposed, that diminished capacity cannot be applied to the simple assault and can only be applied to the abusive sexual contact statute. That, in fact, was repeated by the government in its closing and, of course, repeated by the court in its statement of the jury instructions. So all that evidence that did come in, the jury was then told, disregard as to the alleged offense against Caitlin at the time. You can't consider that. And so we know that evidence is there, and we know the jury was told not to consider it, and I think it raises pretty strong evidence that there was an absence of intent. And I'll address what I think often comes up. Well, they disregarded it as to the felony. There was an intent requirement as to the felony, and it was disregarded. But that intent requirement is drastically different than an intent to frighten. The government pursued that intent requirement as an intent to arouse himself. That is a very different type of intent than an intent to frighten, particularly when we're talking about intoxication. Let me ask you about the supervised release condition, the sort of limited ability for him to be able to see his daughters during this period of time. Why is that substantively unreasonable after the courts made its findings on bail and then replicated them and added to them at sentencing? So I think as to substantiveness, which is what I hear the court asking, I really think Wolfchild makes very clear that you really need a record of a suggestion that Mr. Perez posed a sexual risk to his own daughters, and there's just no evidence of that here. But why does it have to be a sexual risk? Because he got himself intoxicated in front of his daughter, autistic daughter, I believe, right? And the district court keyed in on that as a basis for saying he's not going to have contact cut off, but it'll have to be with the supervision of mom for a period of time. So I think that what the court failed to examine was all the relevant facts surrounding the relationship. There was an earlier order, that order predated by many months the ultimate sentencing, in which there was substantial new evidence. And in neither the order nor at sentencing was there a discussion of the relationship that he had with his daughter, and specifically the testimony from the wife in a penalty of perjury declaration from her that said she had no concern and did not want this condition. And in fact trusted him both before and after the alleged offense. But more importantly- Can I just jump in? I actually have some concerns about this condition. Let me make sure that I understand. Now, when we talk about the wife, that's his second wife, right? Not the biological mother of the defendant's autistic daughter? No, it is, she, her name is Erica Bellano. She is the mother of the seven-year-old daughter, yes. But there was a reference to the defendant being the primary caretaker for his daughter? For an older daughter, so there was an older who now at this point would be 18, honestly, so less relevant. All right, so that's helpful. But I'm not, I didn't quite understand the district court's basis for the restriction. Now, was it out of concern that he posed a threat of sexually, sexual misconduct with the daughter? Or was it based on his fact that he seemed to have an alcohol problem? Certainly not the former. There was zero evidence of any sexual risk to his daughters. In fact, this is, as the probation office went on at length, this is aberrant conduct. This is a single offender. There is no evidence of any past allegations. It looked like he was on vacation and partied too hard. I'm not excusing it at all. What he did was completely, I don't agree with you on the conviction. I think it's going to, in my view, should stand. But the supervisor really seems a little much. And I'm trying to figure out what is it that really drove the district court to that condition. Your Honor, I do think it was the latter of the two things you proposed, which was an alcohol concern. And to the extent there's an alcohol concern, there are alcohol conditions in place to address it. Typically, in supervised release, you just, you enter a condition saying the defendant is barred from consuming alcohol. Correct, Your Honor. You don't take, you don't go farther than that. Agreed, Your Honor. I think that would have been sufficient, particularly here where the concern was alcohol driven, and that the conduct here undisputedly was a question about a passage. So if we came out that way, just on that one issue, what would you suggest? Would we remand for reconsideration of that condition? Your Honor, I think this was very thoroughly considered. This is not for lack of her effort, the district judge consideration. I think it was designed to be punitive, and therefore should just be struck as punitive is not a basis for. Wasn't the district court, in addition to the concern about the drinking, also concerned that this assault happened in the presence of your client's child? I mean, that seems a separate concern altogether. It also happened in the presence of nine other grown people. So this is not a situation where it was secretive or hidden from her or really in any way involved her. She was physically present, as were other adults and children in the area. This is a jacuzzi on a cruise ship. There were many people in the area. So I don't know that that motivation would substantiate barring him from being in his home, the family home, all day and being required to be essentially chaperoned by his wife in any interaction with his daughters. I'm a little surprised to hear you say that you thought that the district court gave thorough consideration to it because I thought one of the procedural due process claims was that there needed to be more analysis at sentencing under Wolfchild and consideration of this extra material from the family and the wife than was given for bail purposes. So aren't those two things running headlong into each other? Your Honor, I agree there could be more elucidation, but I don't know that – I do believe that the court reconsidered. She did not provide substantial additional reasoning at the time of sentencing, which I think would be helpful. But I don't know that even with all the reasoning in the world, we would end up in a world in which there was substantive reasonableness on this record, given that there is no evidence of any sexual risk or sexual abuse of any child that he was ever related to or any risk of any sexual abuse other than the charges in this case. Okay. Can I just – I know we're getting a little – so for the supervised release condition, was it a three-year term? Five. All right. But the judge said after 12 months, the defendant could petition for – where is he in that 12-month sequence right now? Your Honor, he's in custody until October. Oh, he's still in custody. He is, Your Honor. All right. So it hasn't even started yet. No, and in fact, that 12-month period would leave him not living in the family home for four and a half years, even if that early termination were provided for. And I actually think that 12 months – Why is that? Because he had the exact same condition during his bail, during his bond. And he was on bond during the entirety of this case. And so – So after his release, he would not be able to live in the family home either. Correct. And potentially for five additional years. The early termination – I'm sorry. I'm not following. I didn't see that. Why would he not be able to live at home for five years? If this condition were not terminated early in the 12-month period that is contemplated, it would prolong for the entire five-year period, which would leave him outside of the family home for eight and a half years. And I do want to be clear that I actually think that the 12-month period does more harm than good. As Your Honor knows, there is an early termination provision in the statute. You can always ask for early termination. Exactly, Your Honor. And in fact, such a condition does not require a psychological evaluation as this one does. So I actually think that the 12-month period imposes additional burdens on the defense that would not otherwise be available. And those burdens are substantial. Obtaining a psychological evaluation is complicated and difficult. But more importantly, it required the consent of the probation office. And Wolf Child itself said that interference of the probation officer in things like conditions that interfere with familial association doesn't help the matter. In fact, it can encourage further abuses of discretion because we don't know what will or will not be permitted. Okay. Thank you very much. We'll give you a little time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Haba Meral on behalf of the United States. I want to begin here with the standard of review for the jury instructions. Judge Sanchez, I heard you gesturing toward whether plain error or de novo review applies here. Defense counsel has not made any argument for de novo review here. But even if she had, de novo review is not appropriate. This court's exception to the plain error rule applies only where there is a pure issue of law and no prejudice to the non-moving party. Here, the constructive amendment claim is a necessarily inherently factual claim. It's asking this court to comb the record and to decide whether there are any facts in the record that would have supported a conviction for touching any other body part than what was alleged in the indictment. That's a factual analysis that is inappropriate and does not fall within this court's exception to the plain error rule. Moreover, as this court recognized last week in Thompson, this rule is always discretionary and it's particularly inappropriate to exercise it here in light of Rule 30D, which was specifically amended in 2002 after the Supreme Court's case in Jones, where the Supreme Court recognized, look, the way that Rule 30 was drafted at the time didn't actually maybe even barred any form of appellate review for forfeited jury instructions. But we have always applied a plain error review for forfeited jury instructions. And then lo and behold, in 2002, committee adds subsection D, which refers the court to 52B, which sets out the plain error rule. Mr. Merrill, I think we're with you on the plain error side of things. But I'm interested in the simple assault side of this and whether under plain error review the law was clearly established that this is a specific intent crime, because I don't think it is at all. And I wanted to hear your thoughts about that. I think we agree with you, Your Honor, that the law is not specifically established, that simple assault is perhaps not so simple after all, and that this is not a plain error. And I think the government's Rule 28J letter highlights a case, Gobert. And in Gobert, the interesting part there is that the court is saying, okay, what is the least violent form of an assault? And it's the assault we have charged here in the indictment. And the way the court defines the assault there is intentionally using a display of force that reasonably causes a victim to fear immediate bodily harm. That is the exact same language that the court used in its instruction for simple assault. And you see that as a general intent crime, correct? Yes, Your Honor. Okay. Well, Gobert can be interpreted to say, look, this intentional – the words intentionally using a display of force is a threat to inflict injury. So if you interpret Gobert as saying – Right, but there's a difference in my mind between an intent to use force, an intent to act in some kind of way versus the intent to instill fear in another person. And if it's an intent to instill fear, then that's the specific intent to cause fear under the common law. But under the model penal code instructions that were here, I think it's just – it was what you just read under Gobert, isn't it? Yes. So I don't think that it's at all clear – or the error, to the extent it is error, is plain at all. And I think defense counsel has been latching on to this one sentence of Skeet that is arguably dicta. But I think you actually have to look to the facts of Skeet to understand the significance or perhaps lack of significance in that sentence, which is you have Raymond shooting between Robert and Shirley. And it's not entirely clear from that factual record whether Raymond intends to shoot Robert or not. But surely if Raymond had intended to shoot Robert, then there would be no question there's an assault there. But if he didn't intend to shoot Robert, he could still be found guilty of simple assault if he intended to at least threaten bodily injury. So I think Gobert and Skeet make clear that this may not be error at all, much less plain error. And I think government reads cases like Lamont, Fleming, Sutton, Jim, and even the First Circuit's case in Bays to suggest that if this is error, it's not plain. Because guess what? Few areas of the law pose more difficulty than the proper definition of the mens rea, especially the difference between general and specific intent, which has caused this court a good deal of confusion. When we're dealing with statutes, we start with the language of the statute. Is there anything you see in 113, was it A5, that is in any way indicative, words that are indicative of a mens rea requirement? No, and I thank you, Your Honor, for that question. There's no words. There's no kind of magic words that I think the First Circuit recognized in Bays. In other subsections of 113, it uses a specific language of with the intent to. That's a big clue to the court that this is a specific intent crime. And that's why, for example, in the abuse of sexual contact, it does include the language with the intent to abuse, harass, humiliate, degrade, et cetera. That was very clearly a specific intent crime. I think this court's jurisprudence on 113A5 did not give that same clear red light to the court of this is a specific intent crime. But even if this court finds that it was plain error, the defendant has not shown that it affected his substantial rights. And I think this is actually a really unique case in that the defendant was allowed to bring his diminished capacity defense with respect to the abuse of sexual contact claim. And the jury rejected it. The jury found that he had the ability to form the intent to abuse, harass, humiliate, degrade Aileen. And there's no way that the jury would have said, OK, sure, he had the intent. But, I mean, I take counsel's point. That's a different claim and a different set of allegations to that victim. And here there was no allegation of, for this victim, touching of an inappropriate area of the body. And so that's why I assume the government brought forward the simple assault offense rather than the inappropriate touching one. And if you can't have a diminished capacity defense for this claim, why wouldn't that be prejudicial to the defendant? I'm sorry. Could you repeat the last part? I mean, if we were to agree with opposing counsel that this was clear that it should have been a specific intent instruction, I have a hard time seeing why it wouldn't have prejudiced the defendant based on the erroneous jury instruction. Well, I think at the most basic level, the jury found that the defendant had an ability to form an intent. And then the question becomes, what was that intent? With Aileen, the intent could have been abusing her, harassing her, humiliating her. And the jury found that. With Katie, if this court decides that the standard is an intent to instill fear of bodily harm or threaten her, the evidence is there. And I would point the court— I just have to—you know, it's fairly basic that the jury has to decide every element of a charged offense. So if the charged offense is not a specific intent offense, they by definition did not decide the specific intent element. So I agree with my colleague. I just don't see how that can't be anything but per se prejudicial. In other words, the defendant was essentially convicted of a crime for which he was not put on notice in the indictment and did not have an opportunity to consider his defense to and present arguments about a trial. Well, thank you, Judge Tonato. I think this court's plain error analysis still requires the jury—still requires this—for us to show, for example, harmlessness. If we satisfy this harmlessness standard under Conte that the omitted element from the jury instruction— which do not have—you don't have to have a sort of a harmless error analysis. That's a violation of the Sixth Amendment. You don't have to say, well, was it harmless? That was something that I think Apprendi and Alene were crystal clear on. Yes, Your Honor. And I'm happy to provide a 28-J letter in that regard, but I believe— Just your thoughts will be— I believe that, you know, Conte was a case where a jury instruction was—a portion of the jury instruction was omitted. And here the court applied plain error and said, look, the government can show that this error was harmless beyond a reasonable doubt. And therefore, there's no—this didn't affect the defendant's substantial rights. And they still applied the plain error framework there. So in this context, beyond just the fact that the jury found that the defendant could form and did form the intent to—the requisite intent with respect to Alene, it would have found it here and could have found it here with Katie. And arguably that evidence was stronger because with Katie—actually, there were three touches of Katie. And in between touch two and three, Katie moved across the jacuzzi. And her testimony was that she gave the defendant an intimidating look at that—not an intimidating look, a disapproving look at that point when she moved across the jacuzzi. And she saw the defendant move away a little bit. And that gave her the reassurance that, hey, maybe this is over. And that's when she returned to her seat and the defendant touched her for a third time. That is evidence of intent. There's always—there's obviously the time when Katie got out of the jacuzzi and the defendant gave her an intimidating look and mouthed the words, don't tell, to her as she was getting out with her father. And that is corroborated by a third party with no relationship to Katie. Go ahead. I was going to ask about supervised. Yeah, I was as well.  So can you just talk about or tell us where we can find an adequate justification for the imposition of a psychological evaluation before Condition 6 can be modified after 12 months? Sure. I think, Your Honor, the court talked about it extensively during its two-hour sentencing hearing in this case. And the court specifically wanted the expertise of a psychologist to ensure that it was safe to have the defendant return to full custody and full supervision of his daughter here. Why would that be reasonable in the absence of evidence that he poses a sexual threat to his children? Well, Your Honor, I don't read Wolfchild to say that he has to pose a sexual threat, and I don't think the district court either. I think the district court's findings were keyed towards the defendant's irresponsible parenting and the fact that he presented a danger in the way that—just based on the evidence that was presented at the time. Can I just jump in? Every criminal defendant with a family can be accused of irresponsible parenting. I have never seen a condition of this sort that goes to the essence of family life being imposed. And this was not the kind of egregious case that I typically see in my courtroom. I mean, it was a condemnable case. I agree with that. But this was not those extra steps I'm sure you're familiar with from your own practice. So your colleague here surprised me, and I think it makes some sense that this is effectively a five-year ban from being at home. I did not appreciate that. The way it read to me was he could not visit—I think that was the word—between 10 p.m. and 6 a.m. I just assumed, apparently wrongly, that that meant they'd be—you know, he couldn't go into their rooms at night, but he would still be in the house. Now, your colleague is saying that actually he's banned from the house. Now, I'd like to know your view. Is he—can he live at home? Would he be violating his supervised release condition if he lived 24 hours, 7 days a week at home? And if so, isn't that a massively disproportionate restriction? Well, Your Honor, I'd like to begin actually with the history of this condition. And this is a condition that the defendant affirmatively requested from the district court. And this was proposed in November after trial, and the defendant asked if the court would impose this condition, and the court granted his stipulation. So the existence of this condition is of the defendant's own making. Now, to answer your question— You mean from bail release? He was already out on bail. But when he asked for this condition, was it subject to bail release proceedings? I'm trying to understand when he asked for this condition. He had asked—it was a modification after trial. So I believe—and I'd have to double-check the record. Before sentencing. It was after conviction, before sentencing. Okay, that's totally different. That's still not sentencing, though. Yeah. Sure. But the existence of this condition being in place originated with the defendant. No, I'm sorry, but that's so he could remain outside of custody. That's a totally different dynamic than post-trial sentencing. Sure. And I agree with that, Your Honor. But as for the particularized findings here, I think that—I want to answer your question directly. My interpretation and the court's interpretation of these conditions is that he may only be at home between 6 a.m. to 10 p.m. He may not reside at home. And that has been the case, and I'm going to answer that very handily. But I think the court did—this is an extraordinary effort by the district court to make particularized findings based on evidence here. And it's not just that the child is autistic and nonverbal. It's also that he testified that his daughter liked to throw herself into bodies of water. They were in a jacuzzi. They were on a cruise ship. And this defendant, according to his own testimony, is getting blackout drunk. And then there's also the flight of the defendant where he's throwing his stroller down a flight of stairs. There was so much evidence of trial of just irresponsible parenting, but with enough cognition to be able to manipulate— He wasn't convicted of irresponsible parenting, Counsel. He was not, Your Honor. So I just don't see how any district court has the business of saying for five years this man cannot live at home. And it's not a five-year ban entirely. The court recognized that that might be too harsh, and therefore it built in this kind of check-in provision to say at the 12-month mark, let's check in. And I think the court recognizes that, look, the transition back from prison to the community— Well, then why not make it one year? What? Well, then why not make it one year subject to extension? I mean at this moment, it is a five-year condition unless it's modified by the district court, right? And with a psychological evaluation on top of that. I'm sorry. I didn't hear you, Judge Thomas. And it has a psychological evaluation provision if he wants to try and modify it. Yes, it does have the psychological condition. I think the court was well within its discretion. Ultimately, this is an abuse of discretion standard, and the court, while this court, may disagree wholeheartedly. That's not reason to reverse or to— Well, I mean under Wolfchild, we pay very close attention to this sort of familial cutoff-type release conditions. And one concern that I have is—and I agree that the district court was very thorough in the bail release stage of things, of analyzing this. But the court there also noted that it questioned whether Wolfchild would even apply in that context and then went on to kind of analyze it under Wolfchild anyway. But then when you get to sentencing where Wolfchild clearly applies, there's no discussion about the family saying, we don't need this. We don't want this. We don't believe there's a concern of this need for mother to supervise so constantly. Was it inadequate for the court not to address those very specific pieces of evidence that had not come up—well, that had come up newly again in sentencing? So, Your Honor, I see I'm out of time. Yeah, please go ahead. I think the court did address the, quote-unquote, new evidence that the defense counsel brought with respect to Ms. Bolanos' declaration and letters of support from friends and family. The court did read that. In fact, it stepped off the bench in sentencing to consider the totality of all of that evidence and the totality of defense counsel's argument. But it didn't address it, did it? I mean, did the court— It didn't address any type of check-in or psychological counseling or psychological evaluation. And it said, look, at the 12-month mark, let's come back and reconsider this. And this court's case in Blinkensop, this court has recognized that that contributes towards the reasonableness of the condition. But ultimately, even under Wolfchild, while this court does give a close look, it says that this district court is in a better position. It has at its disposal all the evidence, its own impressions of the defendant, and it has wide latitude. And that is why the district court should be granted considerable deference. Listen, I'm all for district court discretion, but there are limits. But can I just ask one closing question? Sure. It's unclear to me what this psych report is supposed to do. I didn't see any diagnosis from somebody that he had a condition that the psych report was going to give an update on remediation or treatment or control. And bad parenting is not a psychological condition. So I just don't understand what the judge is looking for in this psych report that relates to the concern about not being a good parent. I think it's within the discretion of the court to seek professional input on this person's disposition post-imprisonment during this volatile adjustment period of transitioning back to the community. Check in how he's doing. Look, this is a man who's willing to assault a 13- and 19-year-old girl in a jacuzzi back-to-back in front of his daughter. I think the court was well within its discretion to have concerns about that and to seek professional guidance about that. And I think defendant himself also, you know, he's put his mental condition- I'm not contesting the request. I just don't know what the content will be that would be useful. Do you have any insight into that? I don't have any insight, but surely the court requests it and believes that it would be helpful to its decision-making. And the district court is in the best position to make that assessment, Your Honor. Okay. Thank you. We can ask the court to affirm. Thank you, Your Honor, for the additional time. I do want to briefly hit the simple assault. And I understand the court to be asking, and it was a good question about the language of the statute. And I want to be clear, the statute has only two words, and they are simple and assault. So I think when you see those words, there's nothing to do except look to the common law. I don't really know what else we would do except look to the common law. And when we look to the common law, and the defense cited a treatise, Lafave, and I'm going to- L-A-F-A-V-E. I don't know if there's an accent on the E or not. But that treatise, which this court has cited numerous times in Ornelas, went on at length about how much it respected and referred to that treatise in the context of a different common law statute there in attempted robbery, but wholeheartedly adopted the understanding of what the mens rea was and there finding a specific intent element from the common law in which it looked to a treatise. If you take those exact same steps here, we end up in the place in which there is a specific intent requirement for the simple assault. I think what's tough with your position, counsel, is that we could do that, but then why would it have been plain error for the district court to have just thought that up when there's a model instruction that says general intent. And so I think that's the difficulty with reviewing this under a plain error review standard. Ornelas finds plain error and does exactly what the court just defines. Exactly those steps, and Ornelas comes to the conclusion that it's plain error. Now in the end, it doesn't find substantial rights were violated, but for the reasons you've already discussed, I think that that exists here. But it does. It says, well, what else was the court to do? You've got to look at the common law. Not looking at the common law would be error. And we don't accept the model instructions and turn a blind eye and hope that they say what we want them to. I wish we could as a trial attorney. But often the model instructions are plain error. And in fact, in this court's decision in Perez, which is an en banc decision, many cases involve plain error model instructions. So I don't think that answers the question. In fact, it begs it. Because the model instruction in a comment cites to Skeet, it at least opened the door to let's look further at this question. And because there was so much evidence of intent here. There's some notice, right? We're talking about intent. We're having a voluntary intoxication fight. What is the intent requirement could have been considered with some effort. I do briefly want to talk about the supervised release condition. And I understand potentially some court's interest in going with the procedural error. It's the easy way. Make them say why, again, they want this condition. But I just don't think the record here, no matter how you read it, no matter what you look at, offers any support for this condition or any way that it could justify eight and a half years of Mr. Perez not being able to live with his family and not being able to be in the same room as his children without a supervisor. And I think that for that reason, a substantive reasonableness reversal would be appropriate. And that the history of the condition, in fact, makes it worse. As Your Honor noted, it was in a bail context. But more importantly, before that, he was completely prohibited from being with his family at all. He sought the modification so that he could have some time with his children. And now what he's seeking to do is to return home. With that, Your Honor, I would request reversal. Thank you. Thank you. And thank you both for your very helpful arguments. The matter will stand submitted and court is adjourned. All rise.
judges: SANCHEZ, THOMAS, Donato